**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| MAUREEN LYNN MARCIANO, | : |
|  | : |
| Plaintiff, | : |
|  | : Civil Action No. 18-0945 (FLW) |
| v. | : |
|  | : **OPINION** |
| NANCY A. BERRYHILL, | : |
| Acting Commissioner of Social Security, | : |
|  | : |
| Defendant. | : |
|  | : |
|  | : |

**WOLFSON, United States District Judge:**

Maureen Marciano ("Plaintiff") appeals from the final decision of the Acting Commissioner of Social Security, Nancy A. Berryhill ("Defendant"), denying Plaintiff disability benefits under Title II and XVI of the Social Security Act (the "Act"). After reviewing the Administrative Record ("A.R."), the Court finds that the Administrative Law Judge ("ALJ") properly weighed and assigned little weight to the opinions of licensed clinical social worker, Rita Lawler, in addition to Lourdes Montezon, M.D. Accordingly, the ALJ's decision is affirmed.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff was born on October 9, 1972, and she was 40 years old on the alleged disability onset date of April 18, 2013. A.R. 36, 80, 146. Plaintiff attended two years of high school, earned her GED through online courses, and completed specialized training as a medical assistant. A.R. 81, 263. Prior to her alleged disability, Plaintiff worked as an office manager and receptionist. A.R. 49, 264, 270.

On April 17, 2014, Plaintiff applied for social security disability benefits and supplemental security income, alleging disability beginning on April 18, 2013. A.R. 36, 145. Plaintiff's claims were denied on June 10, 2014, A.R. 156-161, and again upon reconsideration on September 13, 2014. A.R. 164-165. Thereafter, Plaintiff requested a hearing, which was held on June 23, 2016, before ALJ Ryan Hoback. A.R. 69. The ALJ determined that Plaintiff was not disabled and denied her claims for social security disability and supplemental security income. A.R. 36-51. Plaintiff requested review by the Appeals Council, which was denied on November 28, 2017. A.R. 1-4. On January 23, 2018, Plaintiff filed the instant appeal.

## A.    Review of the Medical Evidence

Plaintiff has a history of bipolar disorder that pre-dates her alleged disability onset date, for which she occasionally sought mental health treatment at Newton Memorial Hospital Behavioral Health, from 2009 through 2011. A.R. 511-30.

On July 16, 2013, Vivian Jean Deetjen, BA, of Hackettstown Regional Psychiatric, performed an intake assessment on Plaintiff, during which Plaintiff reported various complaints, including difficulty sleeping, racing thoughts, and feeling anxious and overwhelmed; in addition, Plaintiff stated that she became depressed following the birth of her daughter in April of 2013. A.R. 531-32. A mental status exam revealed that Plaintiff's appearance and hygiene were appropriate; she was cooperative; her eye contact, appetite, judgment, and insight were good; she was oriented in all three spheres; her speech was clear and coherent; her thoughts were relevant; and she denied delusions, alcohol use, drug use, and suicidal or homicidal ideations. A.R. 535-40. Plaintiff's mood, however, was anxious and depressed. A.R. 538. Ms. Deetjen diagnosed Plaintiff with "major depressive disorder, single episode, severe without psychotic features," noting a postpartum onset. A.R. 539.

On July 24, 2013, Rayment Mero, M.D., of Hackettstown Regional Psychiatric, examined Plaintiff's psychiatric condition, during which Dr. Mero noted that Plaintiff had a history of mood lability and instability, and difficulties with anger, irritability, and impulsivity. A.R. 475. Plaintiff's reported stressors included interpersonal problems with her boyfriend and loss of gainful employment. A.R. 475. Plaintiff's mental status exam indicated that Plaintiff was neatly dressed and groomed; she was oriented in all three spheres; her speech was normal; her thoughts were goal directed at times, but circumstantial at other times with a "hint of flight of ideas when [discussing] emotionally charged issues"; her judgment and insight were good; her cognition was intact; her sleep and appetite were normal; she did not display any psychotic symptoms; she denied any suicidal thoughts or ideation; and, although she was tearful and restless, she calmed down considerably as the session progressed. A.R. 476. However, Plaintiff's motor movements were "somewhat" labile, and her content of thought was focused on anger, irritability, and depression. A.R. 476. Dr. Mero diagnosed Plaintiff with bipolar I disorder, prescribed Trileptal and Abilify, and recommended that she seek individual therapy on a consistent basis. A.R. 476-77.

On August 7, 2013, during a psychiatric follow-up appointment, Dr. Mero indicated that Plaintiff's medication "seems to have begun to work"; however, Plaintiff's "living situation has clearly exacerbated her mood. It appears that her fiancé has been angry and critical of her, and also [Plaintiff] has spread herself too thin trying to help out a girlfriend . . . ." A.R. 479. Plaintiff's mental status exam revealed that Plaintiff's insight and judgment were fair; her cognition was intact; and her sleep and appetite were normal. A.R. 479. On the other hand, although Plaintiff's affect was initially calm and appropriate, she became somewhat labile and tearful when she discussed "recent" life events; also, her mood was irritable and dysphoric. A.R.

479. Dr. Mero ultimately determined that Plaintiff was "not using good judgment in taking care of herself," increased her medication dosage, and reemphasized the importance of individual therapy. A.R. 479.

On August 16, 2013, Plaintiff reported a "steady improvement" in her overall mood, feeling "very pleased" with her ability to find a part time-job with "a lot of responsibility," which she looked forward to beginning. A.R. 481. Upon examination, Dr. Mero observed that Plaintiff's affect was "calmer" and "more appropriate"; her mood approached euthymia; she displayed much less anger, irritability, and dysphoria; she denied suicidal or homicidal ideations; her insight, judgment, and sleep improved; her cognition was intact; and her appetite was normal. A.R. 481. Dr. Mero diagnosed Plaintiff with bipolar disorder with mixed features, indicated that Plaintiff's overall mood and functioning improved, and increased Plaintiff's medication dosage to help with sleep. A.R. 481.

On September 5, 2013, Plaintiff telephoned crises services and spoke with Rita Lawler, licensed clinical social worker ("LCSW"), of Hackettstown Regional Psychiatric. A.R. 637. Ms. Lawler noted that Plaintiff was experiencing post-partum symptoms, most recently being in a six-week state of mania, during which time she was physically aggressive with her partner. A.R. 637. Plaintiff also reported severe bouts of crying, raging, and overall mood changes causing her to feel "out of control." A.R. 637.

On September 10, 2013, during another psychiatric follow up appointment, Dr. Mero indicated: "[Plaintiff] reports a relatively stable mood . . . . For the most part, she is better in touch with herself and is aware of what she feels and also how she reacts to various situations, which is very positive and indicates good insight into her problem." A.R. 483. Dr. Mero's

evaluation of Plaintiff as to the following were all normal: affect, mood, insight, judgment, cognition, sleep, and judgment. A.R. 483.

On September 20, 2013, Rochelle Steinkohl, a nurse practitioner in Dr. Mero's office, examined Plaintiff. A.R. 555. Although Plaintiff indicated that she "continues to be anxious," "is not sleeping very well," "is easily overwhelmed," and "feels pressured," she reported doing "a lot better than she was." A.R. 555. With the exception of some pressured speech and tense and anxious appearance, Plaintiff's mental status exam revealed fair to normal results with respect to the following: appearance, cooperation, eye contact, motor activity, thoughts, sensorium, orientation, attention, and concentration. A.R. 555. Also, Plaintiff did not display any psychotic symptoms, and she denied obsessions, compulsions, as well as suicidal or homicidal ideations. A.R. 555. Ms. Steinkohl increased Plaintiff's medication dosage. A.R. 555.

On October 10, 2013, Plaintiff reported feeling anxious, difficulty sleeping due to her infant son, and that, although she was looking for employment, she was "not sure if [she could] sustain [work]." A.R. 558. Plaintiff's mental status exam was normal, with the exception of pressured speech, at times, and "some" obsessive thinking and orderliness; Ms. Steinkohl increased Plaintiff's medication dosage. A.R. 558.

On November 1, 2013, Plaintiff complained of feeling tired and "annoyed all the time," stating that she was "worrying about everything." A.R. 485. She also noted that her household responsibilities made her "anxious and irritable," but that she exercises for twenty minutes, twice a day, because it helps "her feel a little bit better temporarily." A.R. 485. Upon examination, Ms. Steinkohl observed that Plaintiff appeared casually dressed, neat, and clean; she was cooperative with good eye contact; her speech and motor activity were normal; her thoughts were organized and directed; her attention and concentration were fair to good; her insight and judgment were

good; her sensorium was clear; she was oriented in all three spheres; and she denied psychotic symptoms, as well as suicidal or homicidal ideations. A.R. 485. However, Plaintiff's mood was "a little down and anxious most of the time"; and she reported obsessions, compulsions, intrusive thoughts based on fears, and increased hand washing." A.R. 485. Ms. Steinkohl adjusted Plaintiff's medication dosage. A.R. 485.

On December 17, 2013, Plaintiff reported "enormous difficulty sleeping, describing at times racing thoughts as well as intrusive thoughts," and that she was contining to look for work. A.R. 564. Plaintiff's mental status exam returned normal results with respect to her appearance, cooperation, speech, motor activity, affect, thoughts, sensorium, and orientation; however, Plaintiff's mood was tearful and anxious; she reported ruminations, intrusive thoughts, and frequent worrying; and her concentration and attention were decreased. A.R. 564. Ms. Steinkohl prescribed Seroquel to assist with Plaintiff's sleep. A.R. 564.

On January 14, 2014, Plaintiff reported feelings of exhaustion, increased anxiety, as well as fears of driving and using elevators. A.R. 568. Plaintiff also described a feeling of "impending doom," stating that she was no longer "enjoying anything." A.R. 568. Ms. Steinkohl's mental status exam indicated fair to normal results with respect to Plaintiff's appearance, cooperation, eye contact, motor activity, thought process, concentration, attention, sensorium, orientation, insight, and judgment. A.R. 568. Conversely, Plaintiff's speech was pressured at times; her mood was dysphoric and anxious; and while she continued to report some obsessions and compulsions, they were occurring "a little" less frequently. A.R. 568. Ms. Steinkohl added Clonazepam to Plaintiff's medications. A.R. 568.

On February 4, 2014, Plaintiff stated that she "felt better" with the Clonazepam; she was having less intrusive thoughts, she was less jerky and nervous, she was feeling less stress, and

she was able to sleep for 10 to 12 hours a night. A.R. 571. Upon examination, Ms. Steinkohl observed that Plaintiff was casually dressed; she was well groomed; she was cooperative with good eye contact; her speech and motor activity were normal; her thoughts were organized; she denied psychotic and manic symptoms, as well as suicidal or homicidal ideations; her obsessions and compulsions decreased; her concentration and attention were fair to good; her sensorium was clear; and she was oriented in all three spheres. A.R. 571. Moreover, Plaintiff described her depression and anxiety as "mild." A.R. 571. Ms. Steinkohl prescribed Plaintiff Lamictal for mood stabilization. A.R. 571.

On March 4, 2014, Ms. Steinkohl noted as follows:

> [Plaintiff] has been very stressed lately. . . . She continues to look for a job, but is unable to find anything within an hour from home. She states that her mornings are difficult. She struggles getting the day started, but once she gets going, she is generally okay . . . . She reports that Clonazepam is managing her anxiety. . . . She says that she has been able to manage at home with chores and the children . . . . She reports that she [has] generally been eating better and tries to use the treadmill, two to three times a week, for approximately 15 to 20 minutes.

A.R. 488. Aside from "mild" anxiety and "some" obsessions and compulsions around cleaning, Plaintiff's mental status exam returned fair to normal results with respect to her appearance, cooperation, eye contact, speech, motor activity, affect, thoughts, concentration, attention, insight, judgment, sensorium, and orientation; she also denied feelings of mania and depression, as well as suicidal or homicidal ideations. A.R. 488. Ms. Steinkohl concluded that, although Plaintiff continued to complain of tiredness because her sleep is interrupted by her 10-month-old son, Plaintiff's mood was "more stable." A.R. 488. Ms. Steinkohl discontinued Plaintiff's use of Seroquel at night. A.R. 488.

On April 1, 2014, Ms. Steinkohl indicated that "Plaintiff has been feeling a little bit more agitated lately, more stressed, the source is primarily about her five-year-old daughter who has

been bullied at school . . . as well as concern about finances." A.R. 491. Moreover, Plaintiff reported increased anxiety, impending doom, negative thoughts, intrusive thoughts before bed, and fearfulness of driving. A.R. 491. Upon examination, Plaintiff's appearance, cooperation, eye contact, speech, motor activity, affect, thoughts, concentration, attention, insight, judgment, sensorium, and orientation were fair to normal; she also denied delusions and hallucinations, and suicidal or homicidal ideations. A.R. 491. However, Plaintiff was anxious and described some obsessions and compulsions. A.R. 491. Mr. Steinkohl concluded that, although Plaintiff was anxious, her mood is "fairly stable," and that Plaintiff "has been able to manage things at home as well as her own personal needs . . . ." A.R. 491.

On April 29, 2014, Plaintiff indicated that she worries "about everything" and reported monetary and familial stressors; however, her dad was providing her with financial assistance. A.R. 501. Plaintiff further indicated that she was capable of completing chores at home[,] caring for her children," and "has continued to exercise" regularly. A.R. 501. Although Plaintiff's mood was anxious, she reported ruminations, and expressed fears of driving, her mental status exam with respect to the following were fair to normal: appearance, cooperation, eye contact, speech, thoughts, concentration, attention, insight, judgment, orientation, and motor activity. A.R. 501. Plaintiff also denied feeling depressed, manic, psychotic, and suicidal or homicidal ideations. A.R. 501. Plaintiff's mood was "more stable," and Ms. Steinkohl increased her medication dosage to further assist with mood stabilization. A.R. 501.

On May 1, 2014, Ms. Lawler, LCSW, completed a Social Security Psychiatric Report on Plaintiff's behalf. Therein, she indicated that Plaintiff experiences between two and five manic episodes per year which varied greatly in duration, and that she suffered from daily anxiety and manic symptoms, the latter of which were manageable with medication. A.R. 471. According to

Ms. Lawler, Plaintiff would also become enraged and that would impact "all areas" of functioning, including social, occupational, and familial, and Plaintiff's "episodes" ended with severe depression or visits to the emergency room. A.R. 471. Ms. Lawler noted that Plaintiff's ability to perform work related activities was "greatly limited or based on [Plaintiff's] emotional stability. She is very sensitive to medication and medication needs to be closely monitored for efficacy." A.R. 472. Finally, Ms. Lawler determined that Plaintiff had acceptable activities of daily living, a supportive partner, her impairments were mental only, and Plaintiff was capable of managing or directing her own interests. A.R. 473.

On June 6, 2014, Ms. Steinkohl reported that Plaintiff felt anxious "all the time" and that "her biggest stress was financial stress," although she was considering "going to school to get some new skills." A.R. 504. Plaintiff indicated that she "worries about something bad happening to her children," "is fearful when driving," and "there are times when she gets knots in her stomach from her anxiety." A.R. 504. With the exception of anxious mood and some obsessive ruminations, Plaintiff's appearance, cooperation, eye contact, speech, motor activity, thoughts, concentration, attention, sensorium, orientation, and judgment were all normal; Plaintiff additionally denied any depression, mania, delusions, hallucinations, and suicidal or homicidal ideations. A.R. 504. Ms. Steinkohl increased Plaintiff's medication and concluded that, although Plaintiff was continuously anxious, her mood was stable, she was capable of sleeping at night, and she could manage the household and children. A.R. 504.

On June 10, 2014, Clara Castillo-Velez, Ph.D, a state agency medical consultant, independently reviewed Plaintiff's medical records. A.R. 188-21. Dr. Castillo-Velez determined that Plaintiff's psychological symptoms either caused insignificant or moderate limitations in her ability to perform various work-related tasks over the course of a normal workday and

workweek, ultimately concluding that Plaintiff "can maintain concentration, persistence and pace for simple tasks." A.R. 121. Likewise, on September 12, 2014, Joan F. Joynson, Ph.D., also a state agency medical consultant, independently reviewed Plaintiff's medical records and assessed a moderate mental residual functional capacity. A.R. 143.

On September 23, 2014, Ms. Steinkohl reported that Plaintiff was "working at Kessler in the Neuro Psych Unit, where she is dealing with people with traumatic brain disorders," although she considered it to be "very difficult, frustrating," and requiring "a lot of patience." A.R. 593. Plaintiff indicated that she initially started as a temp; however, she was offered and accepted a full-time position. A.R. 593. A mental status exam revealed that Plaintiff was dressed in work clothes; she was well groomed; she was cooperative with good eye contact; her speech and motor activity were normal; she denied any psychotic symptoms, and suicidal or homicidal ideations; her concentration and attention were good; her thoughts were organized; her sensorium was clear; and she was oriented in all three spheres. A.R. 593. On the other hand, Plaintiff was anxious; reported obsessive ruminations and impending doom; and she was fearful of "what bad thing will happen." A.R. 593. Ms. Steinkohl prescribed Plaintiff Lexapro. A.R. 593.

On October 21, 2014, Ms. Steinkohl noted that Plaintiff had quit her job after approximately ten weeks due to the following: "it was just too stressful. She was spending approximately 5 hours a day commuting . . . . She states that when she was at work, she was always worrying about if something happened with one of her children, she was so far away . . . how would she be able to help them." A.R. 596. Upon examination, Plaintiff was casually dressed; she was cooperative with good eye contact; although pressured at times; her speech was normal; her motor activity was normal; her thoughts were organized; she denied delusions or

hallucinations and suicidal or homicidal ideations; her attention and concentration were fair to good; her sensorium was clear; and she was oriented. A.R. 596. However, Plaintiff was anxious, and she reported obsessive ruminations, constant worrying, and feelings of guilt. A.R. 596. Ms. Steinkohl concluded her assessment by indicating that Plaintiff was maintaining her usual routine while "looking for other employment." A.R. 596. Ms. Steinkohl discontinued Plaintiff's Lexapro but increased her Lamictal dosage. A.R. 597.

On February 6, 2015, Ms. Steinkohl indicated that Plaintiff "had been doing fine"; however, she was "extremely stressed" because she had to move, which was disrupting and made her feel "completely anxious." A.R. 599. Aside from Plaintiff's anxious mood and, at times, pressured speech, her mental status exam with respect to her appearance, cooperation, eye contact, motor activity, affect, thoughts, sensorium, attention, concentration, and orientation were otherwise fair to normal. A.R. 599. Plaintiff additionally denied delusions, hallucinations, paranoia, and suicidal or homicidal ideations. A.R. 599.

On March 10, 2015, Ms. Steinkohl noted that Plaintiff moved to a new apartment with her family and was in the process of unpacking and getting resettled. A.R. 602. Plaintiff reported increased anxiety in social situations. A.R. 602. Plaintiff's mental status exam was relatively normal, with the exception of anxious mood and obsessive and compulsive tendencies. A.R. 602. Ms. Steinkohl increased Plaintiff's medication dosage. A.R. 602.

On April 28, 2015, Plaintiff "continue[d] to complain of anxiety" and described impending doom; she also indicated that she was starting school in May, which contributed to her anxiety, but she was able to sleep at night and planned on walking on a regular basis. A.R. 611. Notwithstanding her anxious mood, Ms. Steinkohl indicated that Plaintiff's mental status exam with respect to her appearance, cooperation, eye contact, speech, motor activity, affect,

thoughts, sensorium, orientation, concentration, attention, and concentration were fair to good. A.R. 611. Plaintiff also denied all of the following symptoms: depression, mania, delusions, hallucinations, paranoia, obsessive and compulsive tendencies, as well as suicidal or homicidal ideations. A.R. 611.

On June 18, 2015, Ms. Steinkohl reported that Plaintiff withdrew from school because her tuition and grant applications contained errors; however, Plaintiff had hoped to continue in the fall. A.R. 614. Ms. Steinkohl also indicated that Plaintiff recently completed the "last day" of her temporary, six-week job at Weichert, and, although she had hoped it continued, Plaintiff "had lots of anxiety while she was there," relating to her "daughter . . . at school, her children," and finances. A.R. 614. An examination revealed that Plaintiff was casually dressed; she was cooperative with good eye contact; her speech and motor activity were normal; her thoughts were organized; although she was anxious and reported obsessive ruminations, she denied delusions, hallucinations, paranoia, compulsive tendencies, and suicidal or homicidal ideations; her attention and concentration were fair; her sensorium was clear; and she was oriented in all three spheres. A.R. 614.

On August 13, 2015, Plaintiff indicated that was working a part-time job which required her to write reports for a medical doctor, although she continued to experience financial stress. A.R. 618. Plaintiff further indicated difficulties with the following: remaining asleep, leaving her house, and driving her car. A.R. 618. And, while Plaintiff reported chronic anxiety, she experienced fewer racing thoughts and denied panic attacks. A.R. 618. Ms. Steinkohl performed a mental status exam which demonstrated that Plaintiff was casually dressed; she was cooperative with good eye contact; her speech and motor activity were normal; her thoughts were organized; she denied delusions, hallucinations, and suicidal or homicidal ideations; her

attention and judgment were good; her concentration was fair; her sensorium was clear; and she was oriented in all three spheres; however, Plaintiff was anxious, dysphoric, and reported obsessive thinking and compulsions. A.R. 618. Ms. Steinkohl concluded that Plaintiff is not depressed. A.R. 618.

On September 11, 2015, Ms. Steinkohl noted that Plaintiff continued to work part-time, and her father provided financial assistance. A.R. 621. According to Ms. Steinkohl, Plaintiff was moving into her father's rental home, which was described as a "great relief" but "guilt-provoking." A.R. 621. Plaintiff's mental status exam revealed that she was casually dressed; she was cooperative with good eye contact; her speech and motor activity were normal; her thoughts were directed; although she had obsessions, constantly worried, and was tearful about her father's help, she denied delusions, hallucinations, and suicidal or homicidal ideations; her attention and concentration were fair; her sensorium was clear; and she was oriented in all three spheres. A.R. 621.

On October 29, 2015, Plaintiff stated that she "secured full-time employment" which started in one week, and, in addition, she might not move to her father's rental home, because she did not want her daughter to switch schools. A.R. 624. Notwithstanding Plaintiff's pressured speech, anxious mood, and obsessive ruminations, her appearance, cooperation, eye contact, motor activity, thoughts, attention, concentration, sensorium, and orientation were otherwise fair to normal. A.R. 624. Plaintiff also denied psychotic symptoms and suicidal or homicidal ideations. A.R. 624.

On December 1, 2015, Plaintiff indicated that she had been working "in a full-time capacity" for approximately four weeks; however, she was experiencing significant anxiety; difficulty getting ready and dressed to leave for work in the morning, fearfulness of driving,

incessant thoughts, increased difficulty sleeping, and some panic attacks which she managed with medication. A.R. 627. Ms. Steinkohl's mental status exam revealed that Plaintiff was dressed in work clothes; she appeared attractive and well-groomed; she was cooperative with good eye contact; although her speech, at times, was pressured and she felt anxious; her motor activity was normal; her thoughts were organized; she denied psychotic symptoms, obsessions, compulsions, and suicidal or homicidal ideations; her attention and concentration were fair to normal; her sensorium was clear; and she was oriented. A.R. 627. Ms. Steinkohl increased Plaintiff's medication dosage. A.R. 627.

On January 26, 2016, Ms. Steinkohl noted that Plaintiff quit her job because she "could not handle it anymore. She would be . . . very shaky, anxious in the morning before going to work, difficulty falling asleep and staying asleep anticipating going to work." A.R. 630. Plaintiff also reported dizziness from increasing her medication dosage, and headaches from the stress at work. A.R. 630. Plaintiff's mental status exam was relatively normal, with the exception of anxious mood and ruminations. A.R. 630. Ms. Steinkohl concluded that Plaintiff's increased symptoms were secondary to employment. A.R. 630.

On February 18, 2016, Plaintiff expressed concerns about gaining weight and feeling extremely anxious, "worrying about everything," although Plaintiff was capable of doing daily activities and chores. A.R. 633. According to Ms. Steinkohl, Plaintiff was casually dressed and well-groomed; she was cooperative with good eye contact; her speech and motor activity were normal; her thoughts were organized; and she denied psychotic symptoms and suicidal or homicidal ideations; however, Plaintiff felt tearful, sad, and anxious, and she reported ruminations and constant worrying. A.R. 633.

On February 23, 2016, Plaintiff underwent an individual therapy session with Ms. Lawler, during which she reviewed Plaintiff's mental health history and past treatment. A.R. 651. Plaintiff's mood was stable and guarded. A.R. 651. On March 9, 2016, during another individual therapy session with Ms. Lawler, she reported that Plaintiff "has been managing pretty well, she has not been symptomatic." A.R. 652. Ms. Lawler also noted that Plaintiff's mood was stable. A.R. 652.

On March 18, 2016, Lourdes Montezon, M.D., examined Plaintiff, during which she complained of recurrent, obsessive, and racing thoughts, as well as severe anxiety. A.R. 653. Plaintiff stated that, although her Abilify dosage was increased, she did not notice a difference in the way she felt, and her "remarkable" weight gain made her more depressed. A.R. 653. According to Dr. Montezon:

> Plaintiff is alert, oriented as to time, place, and person, paranoid and guarded, but verbally responsive and cooperative. Mood appears to be labile with anxious affect noted. No delusions. No suicidal or homicidal ideations noted. No racing thoughts noted, but patient reports that what incapacitates her at this time is the severe anxiety and racing thoughts, especially when she wakes up in the morning.

A.R. 653. Ultimately, Dr. Montezon diagnosed Plaintiff with bipolar disorder, hypo manic with psychotic like symptoms, concluding that Plaintiff "is still paranoid, still highly anxious and irritable[.]" A.R. 653.

In a letter, dated April 12, 2016, Ms. Lawler stated that she had been treating Plaintiff for approximately eight years, during which time Plaintiff has struggled to manage her mental illness. A.R. 659. Ms. Lawler further stated that, "[t]hroughout the eight years of our work together, [Plaintiff] has had to manage not only bipolar disorder, but also, generalized anxiety disorder. Both of these disorders by themselves can be difficult to manage, together they can be

debilitating. She has been trying to do this while trying to manage a family and often this all becomes overwhelming for her." A.R. 659.

On May 19, 2016, Ms. Lawler completed a Therapist's Opinion form, in which she assessed Plaintiff's ability to perform various mental activities over the course of a normal workday and workweek. According to Ms. Lawler, Plaintiff was not limited in her capacity to perform the following tasks: remember work-like procedures; understand and remember very short and simple instructions; make simple work-related decisions; ask simple questions or request assistance; maintain socially appropriate behavior; and adhere to basic standards of neatness and cleanliness." A.R. 670-71. Ms. Lawler also indicated that Plaintiff could perform the following tasks in a limited, but satisfactory matter: maintain attention for a two hour segment; sustain an ordinary routine without special supervision; perform at a consistent pace without a unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; recognize normal hazards and take appropriate precautions; understand, remember, and carry out detailed instructions; set realistic goals or make plans independently of others.

On the other hand, Ms. Lawler opined that Plaintiff was seriously limited, but not precluded from, working in coordination with others without being unduly distracted; responding appropriately to changes in a routine work setting; and using public transportation. Moreover, in Ms. Lawler's opinion, Plaintiff was unable to meet competitive standards in her ability to maintain regular attendance and punctuality within customary standards; complete a normal workday and workweek without interruptions from psychologically based symptoms; get along with coworkers or peers without unduly distracting them; deal with normal work stress, or the

stress of semiskilled and skilled work. A.R. 670-71. However, notwithstanding such limitations, Plaintiff was capable of managing her own best interests. A.R. 672.

On May 20, 2016, Dr. Montezon completed a Mental Questionnaire and evaluated Plaintiff's ability to perform various work-related tasks over the course of a normal workday and workweek. According to Dr. Montezon, Plaintiff was not limited in her capacity to perform as follows: maintain regular attendance and punctuality; sustain an ordinary routine without special supervision; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; recognize normal hazards and take appropriate precautions; and adhere to basic standards of neatness and cleanliness. A.R. 664. Moreover, Montezon opined that Plaintiff could perform the following tasks in a limited, but satisfactory matter: remember work-like procedures; understand, remember, and carry out very short and simple instructions; maintain attention for two-hour segments; perform at a consistent pace without an unreasonable number and length of rest periods; and respond appropriately to changes in a routine work setting. A.R. 663-64.

Conversely, Dr. Montezon also indicated that Plaintiff was seriously limited, but not precluded, in her ability to deal with normal work stress and understand and remember detailed work instructions; Plaintiff, in addition, was unable to meet competitive standards in making simple work-related decisions; completing a normal workday and workweek without interruptions from psychologically based symptoms; getting along with co-workers or peers without exhibiting behavioral extremes; carrying out detailed instructions; setting realistic goals or making plans independently of others; and dealing with the stress of semiskilled and skilled work. A.R. 663. Lastly, Dr. Montezon stated that Plaintiff was unable to travel in unfamiliar places. A.R. 664.

Dr. Montezon also assessed Plaintiff's functional limitations. In that regard, Dr. Montezon determined that she was moderately limited in her ability to perform activities of daily living and maintain social functioning. However, Dr. Montezon noted a marked limitation in Plaintiff's ability to maintain concentration, persistence or pace, and indicated that Plaintiff has suffered from four or more episodes of decompensation which were at least two weeks in length, within a twelve-month period. A.R. 664. Finally, Dr. Montezon indicated that Plaintiff would require more than four absences from work per month, and that she suffered from the following impairment: "affective disorder and a residual disease process that has resulted in such marginal adjustment, that even a minimal increase in mental demands or change in the environment would cause Plaintiff to decompensate." A.R. 665.

**B.      Review of Disability Determinations**

On April 17, 2014, Plaintiff applied for social security disability benefits and supplemental security income, alleging disability beginning on April 18, 2013. A.R. 36, 145. On June 10, 2014, the Social Security Administration denied Plaintiff's claims. A.R. 156-161. Moreover, on September 13, 2014, the Social Security Administration denied Plaintiff's request for reconsideration, finding that the previous determination denying Plaintiff's claim was proper under the law. A.R. 164-165.

**C.      Review of the Testimonial Record**

On June 23, 2016, Plaintiff appeared and testified at a hearing before the ALJ, A.R. 69, during which she testified about various matters, including her education, prior work experience, impairments, symptoms, and capacity to perform activities of daily living, as well as work-related tasks. A.R. 79-97. Tina Nase, Plaintiff's friend of thirty years, also provided testimony on the behalf of Plaintiff, pertaining to her mental health. A.R. 97-101.

In addition, Agnes Gallen testified as a Vocational Expert ("VE") at the hearing on June 23, 2016. A.R. 102-113. Ms. Gallen testified that Plaintiff's former job as an "office manager" is a "skilled," "sedentary" position, associated with DOT # 169.167-034. A.R. 104. Moreover, the VE indicated that Plaintiff's prior job as a "receptionist" is a "semi-skilled," "sedentary" occupation associated with DOT # 237.367-038. A.R. 104.

The ALJ provided the VE with three hypothetical scenarios, first positing the following question:

> [A]ssume a hypothetical individual of the claimant's age, education with the past jobs that you just described . . . . The individual is limited to—and this is going to be mental limitations only. Limited to perform routine, repetitive tasks, but not at a production rate pace. For example, assembly line work. Use judgment consistent with routine, repetitive tasks, but not at a production rate pace. Limited tolerating occasional changes in a routine work setting defined as that consistent with routine and repetitive tasks, but not at a production rate pace. And, can have occasional interaction with supervisors and coworkers, but no interaction with the public . . . . I would assume that limitation precludes all the past work?

A.R. 105. The VE responded, "[t]hat is correct, Your Honor." A.R. 105. However, when asked whether there were any unskilled occupations in the national economy that the hypothetical individual above could perform, the VE provided that such an individual could work in the following positions: cleaner, housekeeper, DOT # 323.687-014; garment sorter, DOT # 222.687-014; and airplane or bus cleaner, DOT # 919.687-014. A.R. 106. The VE testified that these jobs, in the aggregate, are nationally available in the amount of 768,000, 120,000, and 400,000, respectively. A.R. 106.

The ALJ's second hypothetical was: "[b]uilding from my last hypothetical to my next, what I'm going to do is just add a limitation and that limitation is going to be absent from work three or more days per month. Would that be preclusive?" A.R. 107. The VE answered the ALJ's

question in the affirmative, based on the assumption that the absences would occur on a regular basis. A.R. 107.

Finally, the ALJ's third hypothetical was: "[i]f I make the limitation off task 20 percent or more during an eight-hour workday, same affect of precluding all work[?]" A.R. 107. The VE responded in the affirmative, stating "[y]es, especially if they can't make up the time, Your Honor." A.R. 107.

### D.    ALJ's Findings

The ALJ issued a written decision, following the hearing, on September 19, 2016, A.R. 36-51, wherein he first determined that Plaintiff met the insured status requirement of the Social Security Act to remain insured through December 31, 2019. A.R. 39. Next, the ALJ applied the standard five-step process in considering whether Plaintiff had satisfied her burden of establishing disability.

First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 18, 2013, the alleged onset date. A.R. 26.

Second, the ALJ held that Plaintiff had the following severe impairments: "bipolar disorder and anxiety disorder." A.R. 39-40. In addition to these severe impairments, the ALJ found that Plaintiff had the following non-severe impairments: "vasovagal syncope and obsessive-compulsive disorder." A.R. 40. The ALJ determined that these particular impairments did not cause any functional restrictions, because they were not consistent throughout the claimant's treatment history. A.R. 40.

Third, the ALJ found that Plaintiff does not have an impairment, or a combination of impairments, that meets or medically equals the severity of one of the listed impairments under the Act that would qualify for disability benefits. A.R. 40. Specifically, in this step, the ALJ considered Plaintiff's medical impairments pursuant to listings 12.04 and 12.06 and determined

that their "paragraph B" or "paragraph C" criteria are not satisfied. A.R. 40-42.

Fourth, the ALJ found that Plaintiff possessed the residual functional capacity to perform a full range of work at all exertional levels; however, the following non-exertional limitations applied:

> the claimant can perform routine and repetitive tasks, but not at a production rate pace (e.g. assembly line work). The claimant can use judgment consistent with routine and repetitive tasks but not a production rate pace. The clamant can tolerate occasional changes in a routine work setting, defined as that consistent with routine and repetitive tasks, but not at a production rate pace. She can have occasional interaction with supervisors and coworkers but no interaction with the public.

A.R. 42. In reaching this RFC determination, the ALJ considered Plaintiff's statements concerning her own limitations, relevant medical evidence concerning both her alleged physical and mental impairments, and medical source opinion evidence. A.R. 42.

The ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of such symptoms were not entirely credible, since they could not be corroborated by the relevant objective medical evidence. A.R. 43-44.

The ALJ also assigned little weight to the opinions of Plaintiff's friend who testified at the hearing, Tina Nase, because, as a layperson, she is not medically trained; the ALJ also concluded that her statements were inconsistent with the preponderance of the opinions and observations by the medical doctors. A.R. 43.

The ALJ similarly discredited the findings of licensed clinical social worker, Rita Lawler, who submitted a social security disability psychiatric report, a letter in support of Plaintiff's disability application, and a medical source statement assessing Plaintiff's ability to perform various work-related tasks. A.R. 46-48. In assigning little weight, the ALJ noted that licensed clinical social workers do not qualify as "acceptable medical sources" pursuant to the Act, and

that, in addition, her statements were vague, internally inconsistent, and in conflict with the overall medical record. A.R. 46-48.

The ALJ also discredited the opinion of Dr. Montezon, who made certain findings in connection with Plaintiff's functional limitations and capability to perform work-related tasks. In assigning little weight, the ALJ indicated that her conclusions were unsupported by the medical record and Plaintiff's ability to function outside of the home during the relevant time period, being that she was employed several times. A.R. 48. The ALJ additionally determined that Dr. Montezon's findings were internally inconsistent and assigned a much greater degree of limitation than is supported by the evidence. A.R. 48.

Conversely, the ALJ assigned great weight to the opinions of State agency consultants Clara Castillo-Velez, Ph.D. and Joan F. Joynson, Ph.D., both of whom conducted a psychological review and assessed mild to moderate restrictions in Plaintiff's capacity to perform various work related and daily living activities. A.R. 46.

Fifth, the ALJ found that, taking into consideration Plaintiff's age, education, work experience, and residual function capacity, "there are jobs that exist in significant numbers in the national economy that the claimant can perform." A.R. 50. In reaching this conclusion, the ALJ relied on the testimony of the vocational expert who testified that an individual with Plaintiff's age, education, past relevant work experience, and residual function capacity could perform the following representative occupations: Housekeeper Cleaner DOT # 323.687-014; Garment Sorter DOT # 222.687-014; and Airplane/Bus Cleaner DOT # 919.687-014, which the vocational expert testified exist in the national economy in the aggregate amounts of 728,000, 120,000 and 400,000, respectively. A.R. 50.

Accordingly, the ALJ concluded that "the claimant has not been under a disability, as

defined in the Social Security Act, since April 18, 2013, through the date of this decision . . . ." A.R. 51.

## II.    DISCUSSION

### A.    Standard of Review

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id.* at § 1382c (a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id.* at § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Id.* A claimant who does not have a severe impairment is not considered

disabled. *Id.* at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id.* at § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id.* An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the residual functional capacity to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141. If the claimant is able to perform previous work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her previous work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146-47 n.5; *Plummer*, 186 F.3d at 428. This step requires

the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled. *Id.*

### B.      Analysis

On appeal, Plaintiff proffers one argument as to why the ALJ's decision is unsupported by substantial evidence. Specifically, Plaintiff avers that the ALJ failed to "properly weigh the opinion evidence" at step four of the analysis, because the findings of Ms. Lawler and Dr. Montezon were accorded little weight, while, on the other hand, the opinions of the state agency psychological consultants were assigned greater weight.[1] Plaintiff's Brief in Support of Social Security Appeal ("Pl.'s Brief"), at 20-33. In so finding, Plaintiff argues that the ALJ committed various errors supporting remand.

Specifically, as to Ms. Lawler, Plaintiff contends that the ALJ failed to appropriately consider her opinion in substance, but instead relied on the fact that she is not an "acceptable medical source" as defined under the regulations; moreover, according to Plaintiff, the ALJ failed to articulate a proper basis for determining that her opinion was internally inconsistent, and, in addition, he wrongfully concluded that her findings were in conflict with the medical record. *Id.* Furthermore, as to Dr. Montezon, Plaintiff similarly argues that the ALJ erred in determining that her opinion conflicted with the record. Plaintiff also maintains that the ALJ, in a conclusory fashion, discredited Dr. Montezon's findings as internally inconsistent, and, additionally, wrongfully relied on the fact that Plaintiff "worked several jobs during the relevant period" as a basis for rejecting her opinion. *Id.* at 31-32. The Court disagrees with Plaintiff's

---

[1]      Notwithstanding Plaintiff's challenge to the manner in which the ALJ weighed the opinions of Ms. Lawler and Dr. Montezon, she does not dispute the ALJ's RFC determination at step four of the analysis.

positions and addresses her contentions in turn.

At step four of the analysis, the ALJ is required to formulate a claimant's RFC. *See Chandler v. Comm'r of Soc. Sec.,* 667 F.3d 356, 361 (3d Cir. 2011) ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations."). In performing this inquiry, "the ALJ must consider all evidence before him," and, while the ALJ may weigh the credibility of the evidence, he must additionally provide "some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Burnett v. Comm'r of Social Sec. Admin.*, 220 F.3d 112, 121 (3d. Cir. 2000); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981); *Goldberg v. Colvin*, No. 13-6055, 2015 U.S. Dist. LEXIS 31012, at *24-25 (D.N.J. Mar. 13, 2015).

Otherwise, "[in] the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705. In that regard, the failure to indicate whether contradicting evidence was considered, or to additionally provide a basis for rejecting such evidence, justifies remand; however, the ALJ need not examine "every relevant treatment note" in rendering a decision. *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 435 (3d Cir. 1999); *Fargnoli v. Halter*, 247 F.3d 34, 42 (3d Cir. 2001). Indeed, "[w]here the ALJ's findings of fact are supported by substantial evidence, [courts] are bound by those findings, even if [they] would have decided the factual inquiry differently." *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3d Cir. 2012).

With respect to opinion evidence, a determinable impairment must be established by "acceptable medical sources, defined to only include licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists. *See* 20 CFR 404.1513; 20 CFR 416.913. That is, licensed clinical social workers, such as Ms. Lawler, are not acceptable

medical sources, but are instead classified as "other sources" pursuant to the regulations. As such, findings from other sources may be used for the limited purpose of demonstrating "the severity of [a claimant's] impairment," and, if applicable, their opinions should be evaluated pursuant to those factors which are used to weigh opinion evidence.[2] Indeed, the ALJ "generally should explain the weight given to opinions from these 'other sources" in a manner which "allows a claimant or subsequent reviewer to follow the adjudicator's reasoning[.]" *See* SSR 06-03(p).

Here, the ALJ complied with the pertinent social security regulations in attributing minimal weight to Ms. Lawler's opinions, who submitted a Social Security Disability Psychiatric Report, dated May 1, 2014, on behalf of Plaintiff. A.R. 469-74. In the report, Ms. Lawler indicated that she began treating Plaintiff in September of 2013, and determined that Plaintiff suffers from episodes of mania that impact various areas of functioning; moreover, according to Ms. Lawler, Plaintiff's emotional stability greatly impaired her understanding, memory, sustained concentration, persistence, social interaction, and adaptation. However, the ALJ assigned little weight to these findings, noting that Ms. Lawler is not an "acceptable medical source" and her opinion cannot establish a medically determinable impairment. In addition, the ALJ found that the report was "vague at best, because Ms. Lawler does not give specific function-by-function limitations related to [Plaintiff's] occupational abilities." That is, she failed to provide "specific degree[s] of limitation."

The ALJ also considered Ms. Lawler's letter from April of 2016, A.R. 669, wherein she

---

[2]    These factors include: "[h]ow long the source has known and how frequently the source has seen the individual; [h]ow consistent the opinion is with other evidence; [t]he degree to which the source presents relevant evidence to support an opinion; [h]ow well the source explains the opinion; [w]hether the source has a specialty or area of expertise related to the individual's impairment(s), and; [a]ny other factors that tend to support or refute the opinion. *See* SSR 06-03(p).

stated that Plaintiff struggles to manage her mental illness and that her disorders are debilitating. However, that letter, too, was assigned little weight, as the ALJ again noted that Ms. Lawler is not recognized as an acceptable medical source pursuant to the Act. In addition, the ALJ concluded that Ms. Lawler's determinations were unreliable, because they lacked an acceptable degree of specificity: "[l]ike Ms. Lawler's May 2014 opinion, saying that the claimant's impairments are debilitating does not provide any specific information as to the degree of limitation the claimant would experience." A.R. 47.

Finally, the ALJ considered Ms. Lawler's medical source statement from May 19, 2016, in which she assessed Plaintiff's ability to perform work-related tasks. According to Ms. Lawler, Plaintiff was seriously limited but not precluded from working with or in proximity to others without being unduly distracted; responding appropriately to changes in a routine work setting; and using public transportation. Moreover, Ms. Lawler concluded that Plaintiff was unable to satisfy certain competitive standards in the workplace. These included meeting acceptable expectations regarding punctuality and attendance, as she would require more than four work absences per month; completing a normal workday and workweek without psychologically based interruptions or symptoms; getting along with coworkers without either unduly distracting them or exhibiting behavioral extremes; and handling the stress of semiskilled and skilled work. A.R. 47-48.

The ALJ acknowledged that the medical source statement contained a greater degree of specificity than Ms. Lawler's earlier reports, but it, nevertheless, was accorded little weight on the basis of various deficiencies. Specifically, the ALJ determined that the alleged amount and extent of Plaintiff's limitations were inconsistent with her ability to manage her own interests and perform activities of daily living. The ALJ additionally concluded that Ms. Lawler's

opinions were in conflict with the medical record as a whole, which demonstrated that Plaintiff possessed the capacity of engaging in routine, repetitive work with limitations on her interactions with others. A.R. 48.

Viewed in its entirety, the Court finds that the ALJ rendered a decision in which he provided adequate explanations for discrediting Ms. Lawler's opinions. Indeed, as a threshold issue, the ALJ did not merely dismiss Ms. Lawler's findings because she was not an "acceptable medical source[,]" as Plaintiff contends; to the contrary, he explicitly acknowledged that her opinions were considered for the purpose of understanding how Plaintiff's alleged "impairment affects [her] ability to work." A.R. 47. In fact, the ALJ conducted a substantive analysis and, while not explicitly referenced, clearly assessed the factors pursuant to which medical opinion testimony is weighed. These included, among other things, the specificity of Ms. Lawler's findings, as well as the degree to which her opinion was supported by relevant evidence and the medical record.[3]

In doing so, the ALJ discredited Ms. Lawler's opinions as conclusory—which finding Plaintiff does not dispute—or inconsistent internally and with the medical record. As to the latter deficiency, the ALJ explained that the nature and severity of Plaintiff's alleged limitations were contradicted by her capacity to perform household chores, manage her own interests, and Ms. Lawler's own assessment of a GAF score of 60, which indicates only a moderate degree of limitation. A.R. 47-49. And while Plaintiff disagrees with the reasons which serve as the basis

---

[3]    In arguing that the ALJ failed to properly evaluate Ms. Lawler's findings, Plaintiff primarily relies on *Greenberg v. Comm'r of Soc. Sec.*, No. 16-2312, 2018 U.S. Dist. LEXIS 15660 (D.N.J. Jan. 31, 2018). However, *Greenberg* is readily distinguishable: "[b]eyond noting that [the plaintiff's therapist] was not an 'acceptable medical source' within the meaning of the Act," the ALJ, in that case, "provided limited discussion of [the therapist's] opinion." *Id.* at *36. In contrast, the ALJ, here, considered Ms. Lawrence's opinion in substance and articulated various reasons for discrediting her determinations, pursuant to the factors used for medical opinions.

for determining that Ms. Lawler's opinions are internally inconsistent, such disagreements fail to provide a proper ground for appeal; indeed, it is well established that reviewing "courts are not permitted to re-weigh the evidence or impose their own factual determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011); *Zirnsak v. Colvin*, 777 F.3d 607, 611 (A reviewing court "must not substitute [its] own judgment for that of the fact finder."). Accordingly, the Court holds that the ALJ properly weighed Ms. Lawler's findings. *Wimberly v. Barnhart*, 128 Fed. Appx. 861, 863 (3d Cir. 2005) (holding that the ALJ did not err by refusing to accord controlling weight to an opinion which "was itself internally inconsistent."); *see also Money v. Barnhart*, 91 Fed. Appx. 210, 213 (3d Cir. 2004).

Furthermore, the ALJ also determined that the alleged extent of Plaintiff's limitations, proffered by Ms. Lawler, conflicted with the medical record. According to the ALJ, the medical record, in its entirety, demonstrated that Plaintiff "could maintain routine, repetitive work with limitations on her interactions with others." A.R. 48. Notably, that finding is adequately supported by substantial evidence; Plaintiff's mental status exams were generally normal, with the exception of anxious mood and certain afflictions which irregularly occurred throughout the course of her treatment history. Moreover, both state agency psychological consultants, the opinions of whom were accorded great weight, assessed only mild to moderate restrictions in connection with Plaintiff's capability to perform work related tasks. A.R. 47. Plaintiff, nonetheless, disagrees with the ALJ's characterization of the medical record, from which she cherry-picks certain "abnormal" findings and references only the days when Plaintiff exhibited the following symptoms: "constricted affect, being labile, restless motor function, circumstantial thoughts, only fair insight and record, an irritable and dysphoric mood, decreased or only fair attention and concentration, pressured speech, and being tearful." Pl.'s Brief, 26 (citations

omitted). However, the presence of these ailments—which the ALJ explicitly considered and that occurred inconsistently over the course of a three-year period—fail to demonstrate that his evaluation of the medical record is unsupported by substantial evidence. Pl.'s Brief, at 26. Therefore, the ALJ's assessment of Ms. Lawler's opinion does not warrant remand. *Money v. Barnhart*, 91 Fed. at 213 (affirming the ALJ's decision to discredit a medical opinion which was "inconsistent with other medical evidence").

Next, Plaintiff also contends that the ALJ failed to properly weigh Dr. Montezon's medical determinations, as set forth in a mental health questionnaire at the request of Plaintiff's attorney.

Therein, Dr. Montezon indicated that she first treated Plaintiff in March of 2016 and evaluated her capacity to perform mental activities over the course of a normal workday and workweek. According to Dr. Montezon, Plaintiff was neither limited nor insignificantly limited in her ability to fulfill the following tasks: maintain regular attendance and punctuality; sustain an ordinary routine without special supervision; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; recognize normal hazards and respond accordingly; adhere to basic standards of neatness; remember work-like procedures; understand, remember, and carry out very short and simple instructions; maintain attention for two-hour segments; perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to changes in a routine work setting; and interact appropriately with the general public.

On the other hand, Dr. Montezon opined that, Plaintiff was seriously limited, but not precluded from, dealing with normal work stress, as well as understanding and remembering detailed work-related instructions; in addition, according to Dr. Montezon, Plaintiff was "unable

to meet competitive standards" in her ability to perform the following tasks: make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; get along with co-workers or peers without exhibiting behavioral extremes; carry out detailed instructions; set realistic goals or make plans independently of others; and deal with the stress of semiskilled and skilled work. A.R. 663-64.[4] Lastly, Dr. Montezon indicated that Plaintiff was unable to travel of function in unfamiliar places. A.R. 664.

Dr. Montezon concluded the mental health questionnaire by assessing the limitations which stemmed from Plaintiff's mental impairments, and determined that she was moderately restricted in her ability to perform activities of daily living and maintain social functioning. A.R. 664. Conversely, Dr. Montezon noted a marked limitation in Plaintiff's ability to maintain concentration, persistence, or pace, and determined that Plaintiff experiences four or more episodes of decompensation within a twelve-month period, for a duration of at least two weeks. A.R. 664. Finally, Dr. Montezon indicated that Plaintiff would require more than four absences from work per month, and that she suffered from the following impairment: "affective disorder" and a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicated to cause [Plaintiff] to decompensate." A.R. 665.

Viewed in its entirety, the Court holds that the ALJ, too, properly discredited Dr.

---

[4]     The Court notes that Dr. Montezon's opinion with respect to whether Plaintiff can work in coordination with, or in proximity to, others without being unduly distracted is ambiguously set forth in the mental health questionnaire. Indeed, although she notes that Plaintiff can do so in a satisfactory fashion, she also asserts that Plaintiff lacks the capacity to independently perform that task in a work setting. A.R. 663.

Montezon's findings.[5] Specifically, the ALJ according little weight, reasoning that Dr. Montezon's conclusions were both internally inconsistent and unsupported by Plaintiff's mental status exams. As to the former deficiency, notwithstanding the severity of Plaintiff's alleged limitations, one of which was "marked," the ALJ noted that Dr. Montezon assessed a GAF score of 51 to 55, "indicative of only moderate symptoms." A.R. 49. *Debias v. Astrue*, No. 11-3545, 2012 U.S. Dist. LEXIS 81161, at *26 (E.D. Pa. June 12, 2012) (finding that an ALJ appropriately rejected a treating physician's opinion because the treating physician's findings were inconsistent with a GAF assessment); *Berthold v. Berryhill*, 17-6518, 2018 U.S. Dist. LEXIS 178407, at *18 (D.N.J. Oct. 17, 2018).

Furthermore, the ALJ discredited Dr. Montezon's opinions, because they "assign[ed] a much greater degree of limitation than supported by the evidence." A.R. 48. Particularly, Dr. Montezon determined that Plaintiff was "markedly" limited in her ability to maintain concentration and attention; moreover, she stated that Plaintiff experienced "four or more" episodes of decompensation, each of at least two weeks in length, during which Plaintiff exhibited exacerbations or temporary increases in symptoms accompanied by a loss of adaptive functioning. However, the ALJ found that Dr. Montezon's findings were in conflict with the medical record, being that Plaintiff's "mental status exam[s] have been generally normal with mention of anxious mood and only occasional worsening of depression, attention, and concentration." A.R. 48. In addition, the ALJ reasoned that Plaintiff's alleged inability to function outside of the home, as Dr. Montezon had opined, was undermined by her capacity to

---

[5]     As a preliminary issue, a claimant's treating physician is generally "entitled to careful consideration," and district courts routinely accord "greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all." *Brown v. Astrue*, 649 F.3d 193, 197 n.2 (3d Cir. 2011); *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). Notably, here, the record indicates that Dr. Montezon began treating Plaintiff in March of 2016, approximately three years after her alleged disability onset date, and examined her only on one occasion.

perform several jobs during the relevant time period, one of which lasted more than ten weeks.[6] A.R. 48. Therefore, the Court holds that the ALJ provided an adequate explanation for rejecting Dr. Montezon's findings. *Ford v. Comm'r Soc. Sec.*, 611 Fed. Appx. 102, 104 (3d Cir. 2015) ("[A]n ALJ may discount a treating physician's opinion that either lacks support or is contradicted by other medical evidence.").[7]

## III.   CONCLUSION

For the reasons set forth above, the Court finds that the ALJ properly weighed the opinion evidence of Ms. Lawler and Dr. Montezon, and the ALJ's conclusions are supported by substantial evidence in the record. Accordingly, the ALJ's decision is affirmed, and an appropriate Order shall follow.


Dated: January 30, 2019

/s/ Freda L. Wolfson
Freda L. Wolfson
United States District Judge

---

[6]     Citing various out-of-circuit, non-binding decisions, Plaintiff contends that the ALJ improperly relied on Plaintiff's ability to work several jobs during the relevant time period. Plaintiff's argument, however, is without merit. Contrary to her assertions, the ALJ did not reference that circumstance as a basis for concluding that Plaintiff possesses the capacity to perform "substantial gainful employment," but rather, to undermine Dr. Montezon's assessment that Plaintiff cannot function outside of her home. In any event, the ALJ explicitly noted that Plaintiff's employment during the relevant time period was comprised of "at least semi-skilled occupations," while his RFC determination, in contrast, limited Plaintiff to "unskilled, repetitive, work activity." A.R. 46. Accordingly, I reject Plaintiff's argument.

[7]     Although not disputed, the Court notes that the ALJ properly relied on the opinions of the state agency consultants, having provided an adequate basis for rejecting Dr. Montezon's findings. *Myers v. Barnhart*, 57 Fed. Appx. 990, 996 (3d Cir. 2003) ("As we have previously held, an ALJ can choose to accept the findings of evaluating, non-examining state agency physicians over the opinions of treating physicians where the treating physicians' opinions were 'conclusory and unsupported by the medical evidence' and contradictory to other medical evidence of record.").